# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DONALD T. HOWERTON,

     Plaintiff,

     v.

BOARD OF EDUCATION OF PRINCE
GEORGE'S COUNTY,

     Defendant.

Civil Action No. TDC-14-0242

## MEMORANDUM OPINION

Plaintiff Donald T. Howerton has filed suit against Defendant Board of Education of Prince George's County (the "Board"), alleging race discrimination in promotion decisions, a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* (2012), and Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. §§ 200d-7 *et seq.* (2012). Presently pending is the Board's Motion for Summary Judgment. The Motion is fully briefed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014). For the following reasons, the Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The following facts are presented in the light most favorable to Howerton, the nonmoving party:

## I.    1998 – 2011: Early Employment with the Prince George's County Public Schools

Howerton is a white male in his early forties, currently employed with the Prince George's County Public Schools ("PGCPS"). He does not have a college degree, but has taken

some night classes at Prince George's Community College and the College of Southern Maryland. He has completed the Master Electrical Code Calculation Class, received a Maryland State Master Electrical License, and obtained a certificate in project management.

PGCPS hired Howerton as an Electrician II in 1998. From 1998 to December 2006, Howerton worked as a field technician and fire alarm technician. On December 11, 2006, Howerton was promoted to Maintenance Technician, where he was the assistant to Maintenance Supervisor John Unkle, who is also white. As Unkle's assistant, Howerton managed the maintenance personnel and oversaw the maintenance personnel job interview process. When Unkle retired on January 28, 2011, Howerton became Acting Maintenance Supervisor. From 2007 to 2010, while Unkle served as Howerton's supervisor, Howerton always received ratings of "outstanding" in all categories of his annual performance evaluations. *See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. ("Pl.'s Opp.") Ex. 2, ECF No. 26-2.

## II.   April – June 2011: Demotion

On April 12, 2011, a few months after Howerton became Acting Maintenance Supervisor, Bonita Coleman Potter, the Associate Superintendent of PGCPS, called Howerton and requested that he "force place" an African American employee into the position of Lead Carpenter. Howerton Aff. ¶¶ 18–19, ECF No. 26-1. Dr. Potter is African American. Referring to former Maintenance Supervisor Unkle, Dr. Potter told Howerton that, now that the "old guard was gone," she would "clean house and make changes." *Id.* ¶ 20. Dr. Potter told Howerton that she was not pleased with the job interview process, suggested to Howerton that African American applicants "were being held back," and that she had grown tired of the "good ol' boy system." *Id.* She told Howerton that "things were going to change." *Id.*

2

Dr. Potter suggested that Howerton fill the Lead Carpenter position with Greg Sprigs, an African American employee. Dr. Potter explained that "constituents and high ranking officials," including an African American Maryland state senator, were pressuring her to "fix the problem with Mr. Sprigs." *Id.* ¶ 22. Sprigs had previously interviewed for the Lead Carpenter position in September 2010, but was not selected. He had scored the lowest of the eight applicants for the position. When Howerton replied that the Lead Carpenter position had been filled, Dr. Potter interrupted him, raised her voice, and said, "Oh come on, Don, I know how this works! Don't even try that!" *Id.* ¶ 23. Dr. Potter told Howerton that she wanted Sprigs in the position and that Howerton "needed to play ball." *Id.* Howerton refused to hire Sprigs as Lead Carpenter. In response, Dr. Potter grew very agitated and told Howerton that she would look into the situation and that Howerton should expect to hear from her. She told Howerton that he better have his "i's dotted and t's crossed." *Id.* ¶ 26.

On June 13, 2011, Howerton received a letter informing him that the Acting Maintenance Supervisor position was being eliminated at the end of the month due to budget cuts. The letter stated that Howerton would return to the Maintenance Technician position that he previously held. Following the transition, Carl Belcher, the Director of Building Services, became Howerton's immediate supervisor. Belcher is African American. Unlike before, Howerton was no longer allowed to supervise the maintenance personnel or manage the job interview process. Howerton told Belcher about the conversation he had with Dr. Potter about force placing an African American employee, that he was disappointed that he lost the Acting Maintenance Supervisor position, and that he wanted to get a promotion.

3

### III.    January – February 2012: First Reprimand Letter

On January 6, 2012, Howerton became involved in an incident with Donna Young, an employee in the Purchasing Department.  When Howerton confronted Young after she made untrue claims about the maintenance staff, Young pointed her finger in his face and yelled, "Oh . . . you messed with the wrong person.  I'm going to come after you."  Howerton Aff. ¶ 35. Howerton reported the incident to Belcher and asked Belcher to take disciplinary action against her.  *Id.* ¶ 36.  Instead, on January 9, 2012, Belcher issued Howerton a warning letter for his conduct.  The letter read:

> It is with deep regret that I must issue this warning letter to you regarding your improper behavior.  It is especially disappointing as Thursday, January 5, we had discussed control of your temper and your frustration with other employees.  It was very appalling that the very next day, you engaged in a heated confrontation with Ms. Donna Young of Purchasing Department.  During the confrontation, you ignored my instructions to disengage from the confrontation. . . .
>
> Going forward, your behavior and work performance will be closely monitored. You are hereby warned that further unsatisfactory performance on your part will result in disciplinary action which may include the withholding of a salary increment when due, suspension, or termination of your employment with Prince George's County Public Schools.

Pl.'s Opp. Ex. 5, ECF No. 26-5.

On several occasions in February 2012, Belcher suggested that Howerton could not be placed in charge of the maintenance personnel because Howerton "only hired white people." Howerton Aff. ¶ 40.  Belcher communicated that sentiment to other employees, making it difficult for Howerton to interact with coworkers, most of whom were African American. Belcher also called Howerton a "hot head" and accused him of using steroids.  *Id.* ¶ 41.  On February 3, 2012, Howerton asked Belcher for a transfer to another department, but Belcher refused, stating that Howerton was the "best employee he had" and that the "department would crumble" if Howerton left.  *Id.* ¶ 43.  From February 7 to February 12, 2012, Howerton either

personally received or heard about several anonymous, prank phone calls.  He received a call from someone claiming to be a police officer investigating an assault by Howerton and stating that Howerton had been arrested for assaulting an employee.  A co-worker reported receiving an anonymous call claiming that there had been a fist fight between Howerton and Belcher and that Howerton had been arrested.  Then on February 12, Belcher told Howerton that he had received an anonymous call accusing Howerton of sexually harassing female staff members.  Belcher told Howerton that he had investigated the sexual harassment claim and found no evidence to support it, but he then said to Howerton, "What would happen if your wife found out?"  *Id.* ¶ 49.  Following the conversation with Belcher, Howerton emailed a union representative to complain about a hostile work environment.

## IV.    January 2012 – January 2013: The Facilities Coordinator Position

In January 2012, Howerton applied for a Facilities Coordinator position.  The position description read, "Graduation from college or a university with a degree in construction management, engineering, business administration or a related field . . . preferred; or any equivalent combination of experience or training."  Pl.'s Opp. Ex. 6, at 1, ECF No. 26-6.  On March 23, 2012, Howerton learned that, even though the Human Resources Department had placed him on a list of prequalified candidates to be interview for the position, Belcher would not interview him for the position because he "had someone else in mind."  Howerton Aff. ¶ 51.  A four-member panel selected Dion Golatt, who is African American, for the position.  Howerton complained to his union representative about not receiving an interview and told Belcher about his complaint on March 28, 2012.  Belcher told Howerton that, under the terms of the union contract, the January 9 warning letter rendered Howerton ineligible for promotion.  On August 7, 2012, Howerton complained to Keith Miles, the Chief of Supporting Services, who directed

Belcher to "rectify the situation." *Id.* ¶ 53. Although Belcher had admitted to Miles that he should have interviewed Howerton, Belcher took no further action. On August 8, 2012, Howerton filed a grievance with his union against Belcher relating to the failure to interview him.

On August 28, 2012, Belcher stopped Howerton in the hallway and, in front of other employees, questioned Howerton about the grievance. As Howerton began to answer him, Belcher interrupted and said, "Oh, I know how to handle this now. I got you now." *Id.* ¶ 58. On September 5, 2012, Howerton, his union representative, Belcher, and PGCPS Acting Chief Operating Officer Monica Goldson, met to discuss Howerton's grievance against Belcher. During the meeting, Howerton complained that he had been discriminated against in the hiring process for the Facilities Coordinator position and expressed concerns about retaliation. Goldson assured Howerton that he would be informed of any future job openings, but she never opened an investigation or took any disciplinary action against Belcher. On December 14, 2012, Howerton asked about an open Maintenance Supervisor position, the same position he held before the reduction in force. Goldson responded that there was no such position, and Belcher warned Howerton to stop asking questions and to be "careful." *Id.* ¶¶ 65–66.

On January 10, 2013, Howerton filed a discrimination charge with the United States Equal Employment Opportunity Commission ("EEOC"). He marked the boxes for "Race" and "Retaliation," and alleged that Belcher denied him an interview for the Facilities Coordinator position because of his race. On March 8, 2013, the EEOC issued Howerton a right to sue letter and advised him that he could file a lawsuit within 90 days. Howerton did not file a lawsuit.

### V.    January-February 2013:  Second Reprimand Letter

On January 8, 2013, Howerton became involved in an incident with Lacy Lanham, an employee who dropped several boxes on the floor of Howerton's office, stating that she had done so at Belcher's direction.  After Howerton commented to a coworker who shared the office that "Someone has their facts mixed up," Lanham began to shout at Howerton and use profanity. Howerton Aff. ¶ 69.  Howerton immediately complained about the incident to Belcher, who threatened to take disciplinary action against Howerton and Lanham.  On January 17, 2013, Belcher gave Howerton another warning letter, which read in part:

> Despite the [January 9, 2012] warning letter you were involved in yet another incident with Lacy Lanham. . . Shortly after that incident you were disrespectful to me as I tried to resolve the conflict between the two of you.
>
> After this incident, you stormed out of the workplace and building without approved leave. You were absent without approved leave for the remainder of the week. . . . This insubordination is causing me to perform a mid-year performance evaluation which I will schedule with you shortly. . . .
>
> Please be mindful that any future instances involving this or similar behavior will result in your recommendation to the Supt. of Schools for more serious disciplinary action against you, up to and including termination.

Pl.'s Opp. Ex. 10, ECF No. 26-10.

On February 15, 2013, Howerton and his union representative met again with Acting Chief Operating Officer Goldson about Howerton's concern that Belcher was "papering" his personnel file with derogatory information.  Howerton voiced his concern that he was being retaliated against and told Goldson that he was seeking legal advice, to which Goldson replied, "You can try that if you want."  Howerton Aff. ¶ 78.  In March 2013, Howerton complained to Elizabeth Davis, a PGCPS Compliance Officer, about his concern that Belcher was intentionally "papering" his personnel file with written reprimands.  *Id.* ¶ 79.  Davis encouraged Howerton to speak with Belcher rather than file a written discrimination complaint.  When Howerton spoke to

Belcher about his concern, Belcher became very agitated and warned Howerton that he was "digging a deeper hole" for himself by complaining. *Id.* ¶ 82.

## VI.     April – June 2013: Suspension

On April 3, 2013, Howerton became involved in a third incident with another employee, Antonio Proctor. Proctor questioned Howerton about an email that he had sent earlier in the day regarding his scanner, including asking why Howerton had copied Belcher on the email. Proctor used profanity, put his arm in Howerton's chest, and shoved Howerton backwards. As Howerton walked toward Belcher's office to report the incident, Proctor followed him and continued to threaten him. When Howerton did not find Belcher, he reported the incident by email and was later questioned about the matter by Belcher.

On June 3, 2013, James R. Whattam, the Director of Employee and Labor Relations, suspended Howerton as a consequence of the altercation with Proctor. The suspension letter, which stated that Howerton had asked Proctor to "take it outside" for a fight, specified that the decision to suspend Howerton came after Whattam reviewed his personnel file and found the two reprimand letters he received on January 9, 2012 and January 17, 2013. Pl.'s Opp. Ex. 13, at 1, ECF No. 26-13. The letter also stated that "[a]ny future instances involving inappropriate and unprofessional behavior in the workplace will result in my recommendation to the Chief of Support Services for more serious disciplinary action against you, up to and including termination of employment." *Id.*

## VII.    April – June 2013: The Shops Coordinator Position

On April 13, 2013, Howerton applied for a Shops Coordinator position. Although Human Resources confirmed that Howerton was qualified for the position and on the interview list, he was not interviewed. Instead, the position went to Mark Tolan, who is African American.

8

On June 20, 2013, Howerton filed a discrimination charge with the Prince George's County Human Relations Commission ("PGCHRC") and the EEOC.  In the charge, Howerton marked the box for "Race" and wrote that he was discriminated against based on race when he was denied an interview for the Shops Coordinator position.  Pl.'s Opp. Ex. 13, ECF No. 26-13.

## VIII.   May 2013: Third Reprimand Letter

On May 2, 2013, Belcher wrote another reprimand letter to Howerton regarding a renovation project at Old Greenbelt Middle School.  The letter stated that Howerton failed to provide information on the project to management and did not timely request funding needed for the project, then added that the failure to meet all further milestones and deadlines in the project "may result in further disciplinary action which may include the withholding of salary increment when due, suspension, or termination of your employment with Prince George's County Public Schools."  Pl.'s Opp. Ex. 12, ECF No. 26-12.  Belcher wrote the letter and placed the reprimand letter in Howerton's personnel file without notifying Howerton.  Howerton asserts that the accusations in the letter are false.  On June 20, 2013, Howerton complained to the Chief of Supporting Services about the reprimand letter.

## IX.   June 2013: Performance Evaluation

On June 25, 2013, Belcher became angry when he learned that Howerton had discovered the reprimand letter.  Belcher warned Howerton that he was "digging a deeper hole," that he "better stop making trouble" or he would "end up gone," and that he could make things more difficult for Howerton.  Howerton Aff. ¶¶ 97–98.  On June 27, 2013, Belcher provided Howerton with a performance evaluation for the first time.  The performance evaluation form had 37 evaluative criteria across six larger categories.  Howerton scored "Meets Standards," the third highest of five rating categories, in all but six criteria.  Howerton scored "Below Standards," the

fourth highest of the rating categories, for written and oral communication, the ability to adapt easily to new situations, and the ability to cooperate with his supervisor. He scored "Unsatisfactory," the lowest rating category, for the ability to receive constructive criticism well, the ability to work well with others, and the ability to deal tactfully with the public. Given these individual scores, Howerton scored "Below Standards" overall for the "Relationships with Others" category. He received no ratings in the top two categories, "Outstanding" and "Exceeds Standards."

## X.    The Present Case

On March 19, 2014, the EEOC issued Howerton a right to sue letter for his June 20, 2013 charge. He filed the present action on March 18, 2014, alleging race discrimination in the failure to promote under Title VII (Count One), race discrimination in the failure to promote under Title VI (Count Two), retaliation under Title VII (Count Three), retaliation under Title VI (Count Four), hostile work environment under Title VII (Count Five), and hostile work environment under Title VI (Count Six). Following the completion of discovery, the Board now moves for summary judgment.

## DISCUSSION

The Board argues that, as an initial matter, Howerton has failed to exhaust all of his claims under Title VII, except the race discrimination claim for failure to promote him to the Shops Coordinator position, which Howerton asserted in his June 2013 EEOC charge. It also argues that Howerton's Title VI claims are limited by the two-year statute of limitations, effectively barring Howerton's hostile work environment claim under Title VI. For the remaining claims, the Board seeks summary judgment on the failure to promote claims because Howerton was not the most qualified candidate for the Facilities Coordinator position, and

another employee was placed in the Shops Coordinator position to accommodate that employee's disability. On the hostile work environment claims, the Board argues that it is entitled to summary judgment because the claims are based on generalized workplace grievances that are not sufficiently severe or pervasive to form a hostile work environment. Finally, the Board seeks summary judgment on Howerton's retaliation claims on the ground that the warning letters and negative job evaluation are not adverse employment actions and that Howerton cannot otherwise show a causal connection between any adverse employment action and protected activity. The Court addresses these arguments in turn.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Felty v. Grave–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient

evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

## II.    Exhaustion of Administrative Remedies

As a threshold matter, the Board argues that Howerton has failed to exhaust administrative remedies on all of his Title VII claims, including claims of discriminatory failure to promote, hostile work environment, and retaliation, with the exception of his claim of race discrimination in the failure to promote him to the position of Shops Coordinator. Before filing suit under Title VII, a plaintiff is required to file a charge of discrimination with the EEOC and exhaust the administrative process. *See* 42 U.S.C. § 2000e-5(f)(1) (2012). The failure to exhaust administrative remedies under Title VII deprives the court of subject matter jurisdiction over the claim. *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). The allegations in the EEOC charge limit the scope of any subsequent civil suit. *Id.*; *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Jones*, 551 F.3d at 300 (quoting *Evans v. Techs. Applications & Servs. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)). If the Title VII claims raised in the civil suit exceed the scope of the claims raised in the EEOC charge, the Title VII claims are barred. *Id.* (quoting *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995)). A plaintiff's claim generally will be barred if the EEOC charge alleges discrimination on one basis—such as race—and he introduces another basis in formal litigation—such as sex." *Chacko*, 429 F.3d at 509. Likewise, a claim is typically barred if the EEOC charge alleges one type of discrimination—such as discriminatory failure to promote— and the claim encompasses another type—such as discrimination in pay and benefits." *Id.*

Here, Howerton filed two EEOC charges. On January 10, 2013, he filed an EEOC charge alleging discrimination in the failure to promote him to the position of Facilities Coordinator and was notified of his right to sue on March 8, 2013. On June 27, 2013, he filed an EEOC charge alleging discrimination in the failure to promote him to the position of Shops Coordinator and received a right-to-sue letter on March 19, 2014. Because a plaintiff must file suit within 90 days after receiving notice of the right to sue, *see* 42 U.S.C. § 2000e-5(f)(1), and Howerton filed his Complaint on March 18, 2014, he may not proceed on the first EEOC charge and thus may not assert a Title VII claim based on failure to promote to the Facilities Coordinator position. He may proceed on the second EEOC charge and thus may assert a Title VII claim based on failure to promote to the Shops Coordinator position. *Id.* Having failed to assert a hostile work environment claim in the second EEOC charge, the Title VII hostile work environment claim is beyond the scope of the EEOC charge and is barred. *See Jones*, 551 F.3d at 301.

Howerton may bring a Title VII retaliation claim in this action, even though he did not assert that claim in the second EEOC charge. A retaliation claim need not be exhausted under Title VII if the retaliation is related to the filing of the EEOC charge. *Id.* at 302. To the extent that Howerton's retaliation claim under Title VII relates to the filing of his second EEOC charge, the claim is not barred for failure to exhaust administrative remedies.

Accordingly, Howerton's Title VII claims for failure to promote to the Facilities Coordinator position (contained in Count One) and for hostile work environment (Count Five), are dismissed. Howerton may, however, proceed on his Title VI claims for failure to promote to the Facilities Coordinator position (contained in Count Two) and for hostile work environment (Count Six). *See Crest St. Cmty. Council, Inc. v. N.C. Dep't of Transp.*, 769 F.2d 1025, 1030

(4th Cir. 1985) (declining to review the district court's conclusion that Title VI does not require exhaustion of administrative remedies), *reversed on other grounds*, 479 U.S. 6 (1986). *Cf. Cannon v. Univ. of Chicago*, 441 U.S. 677, 706 n.40, 41 (1979) (finding that analogous Title IX cases do not have exhaustion requirements).

### III.    Statute of Limitations

In its Reply brief, the Board argues that Count Six, Howerton's Title VI hostile work environment claim, is barred by a two-year statute of limitations.[1]  Because Title VI does not have an express statute of limitations, it borrows the limitations period from the most analogous state law. *See Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) (applying Maryland's general three-year limitations period to a Title VI claim, prior to the enactment of Maryland's discrimination statute in 2009); *see also Moore v. Greenwood Sch. Dist. No. 52*, 195 F. App'x 140, 143 (4th Cir. 2006) (applying the statute of limitations for the South Carolina anti-discrimination statute to a Title VI claim).  Maryland law applies a two-year statute of limitations for employment discrimination actions.  Md. Code Ann., State Gov't §§ 20-606(a)(1)(i), 20-1013(a)(3) (West 2015).  Thus, a two-year statute of limitations applies to Howerton's Title VI claims, such that any Title VI claims arising before March 18, 2012 are barred.

As the Fourth Circuit has noted in the Title VII context, however, the court may consider a hostile work environment claim, including behavior outside the statutory time period, so long as "an act contributing to that hostile environment takes place within the statutory time period." *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 140 (4th Cir. 2009); *see Peters v. Jenney*,

---

[1] Because the Court has concluded that Howerton's Title VII hostile work environment is barred for failure to exhaust administrative remedies, it need not address the Board's argument that that claim is barred by Title VII's requirement that the EEOC charge be filed within 300 days of the discriminatory conduct.  42 U.S.C. § 2000e-5(e)(1).

327 F.3d 307, 320 (4th Cir. 2003) (applying a Title VII standard to a Title VI claim). The rationale behind this "continuing violation doctrine" is that a hostile work environment claim by its nature requires repeated conduct that can occur over the span of days or years, not necessarily on one particular day. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (holding that if one act contributing to a hostile work environment occurs within the filing period, "the entire time period of the hostile work environment may be considered").

Here, Howerton has alleged a hostile work environment spanning months. Although much of the allegedly harassing conduct occurred in January and February 2012, such as the anonymous phone calls, he also claims that verbal threats and "papering" of his personnel file by Belcher contributed to the hostile work environment. These threats presumably include responses to Howerton's complaints about discrimination and retaliation between August 28, 2012 and June 25, 2013. The "papering" presumably includes Belcher's insertion of what he considers to be unjustified reprimand letters in his personnel file in January 2013 and May 2013. Thus, because the Title VI hostile work environment claim includes conduct within the statute of limitations period, the Court will not dismiss the claim as time-barred.

## IV.    **Failure to Promote**

The Board seeks summary judgment on Howerton's claims of discrimination in the failure to promote. Howerton claims race discrimination under both Title VII and Title VI arising from the decisions not to interview him for, and promote him to, the positions of Facilities Coordinator and Shops Coordinator. As discussed above, because Howerton did not exhaust administrative remedies on his claim relating to the Facilities Coordinator position, the Court will consider that claim under Title VI only. *See supra* Part II.

Title VII makes it unlawful for an employer "to fail or refuse to hire . . . any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Similarly, Title VI prohibits "any program or activity receiving Federal financial assistance" from discriminating against any person "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. To evaluate the claims under either statute, courts apply the burden-shifting scheme outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011) (Title VII); *Middlebrooks v. Univ. of Md.*, 166 F.3d 1209, 1999 WL 7860, at *5 (4th Cir. Jan. 11, 1999) (Title VI) (citing *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985)). Here, the burden is first on the plaintiff to establish a *prima facie* case of discrimination. *Adams*, 640 F.3d at 558 (citation omitted). Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for failing to promote the plaintiff. *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported reasons are a "pretext for discrimination." *Id.* at 558–59 (quoting *Hill*, 354 F.3d at 285).

## A. *Prima Facie* Case

To establish a *prima facie* case for failure to promote, the plaintiff must show that (1) he or she is a member of a protected class; (2) the employer had an open position for which the plaintiff applied; (3) at the time of the failure to promote, the plaintiff was performing his job at a level that met the employer's legitimate expectations and was qualified for the position; and (4) the plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Adams*, 640 F.3d at 558 (citation omitted). The first, second, and

fourth prongs are not in dispute. Howerton is a member of a protected class. *See McDonald v. Santa Fe Transp. Co.*, 427 U.S. 273, 279–80 (1975) (finding that white employees are among the class of individuals that these statutes aim to protect). He applied for the open positions of Facilities Coordinator and Shops Coordinator. As both positions were filled with African American employees, Howerton has shown that he was rejected under circumstances giving rise to an inference of unlawful discrimination. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994) (finding that a plaintiff can establish circumstances giving rise to an inference of unlawful discrimination by showing that the position was filled by an individual from outside the protected class).

At issue here is the third prong. The Board argues that it is entitled to summary judgment on the failure to promote claims because Howerton was not qualified or less qualified than other applicants for the Facilities Coordinator and Shops Coordinator positions because he lacked a college degree. In order to establish a *prima facie* case, however, Howerton is not required to establish that he was more qualified than other applicants, only that he met the minimum qualifications for the position. *See Autry v. N.C. Dep't of Human Res.*, 820 F.2d 1384, 1385–86 (4th Cir. 1987) (noting that a plaintiff had established the third prong when she was among a group of candidates who met the minimum qualifications for a promotion).

The job posting for the Facilities Coordinator position specified that a college degree was "preferred," not required, and provided that "any equivalent combination of experience or training" could provide "the required knowledge, skills and abilities." Pl.'s Opp. Ex. 6, at 1. The position required an applicant to have "considerable knowledge" of the principles and practices associated with building, equipment, and grounds maintenance work. *Id.* It also required a "[t]horough knowledge of construction methods" and "skill in personnel, financial,

and administrative management." *Id.* Thus, Howerton's lack of a college degree did not disqualify him from this position. Moreover, Howerton's placement on the interview list by the Human Resources Department is sufficient to permit a reasonable factfinder to conclude that he had garnered the equivalent combination of experience and training in maintenance work through his years as an Electrician II, a Maintenance Technician, and Acting Maintenance Supervisor to be qualified for the position, despite lacking a college degree.

As for the Shops Coordinator position, Howerton also received confirmation from Human Resources that he was qualified for the position and would be placed on the list of candidates to be interviewed. Howerton Aff. ¶ 91. This evidence is sufficient to permit a finding that Howerton established a *prima facie* case for discriminatory failure to promote him to the Facilities Coordinator and Shops Coordinator positions. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The burden of establishing a *prima facie* case of disparate treatment is not onerous."); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (characterizing the requirements of the *McDonnell Douglas* analysis as "relatively modest" (citation and internal quotation marks omitted)).

### B.       Legitimate, Nondiscriminatory Reason

The next step in the analysis is determining whether the Board has offered a legitimate, nondiscriminatory reason for failing to promote Howerton. *Adams*, 640 F.3d at 558 (quoting *Hill*, 354 F.3d at 285). If the Board meets this requirement, the burden shifts back to Howerton to show that the stated reasons were not the true reasons, but were a pretext for discrimination. *Adams*, 640 F.3d at 558-59.

### 1.    Facilities Coordinator

The Board has satisfied its burden with respect to the Facilities Coordinator position. The Board asserts that Howerton was not promoted to the position of Facilities Coordinator because he was less qualified than Dion Golatt, the candidate ultimately selected. Unlike Howerton, Golatt had a college degree, having received a Bachelor of Science degree in architectural engineering from North Carolina Agricultural and Technical State University in 1991. Def.'s Mem. Supp. Mot. Summ. J. Ex. 9, at 2, ECF No. 25-10. Golatt began working as an engineer in 1991, and worked in several construction and maintenance positions where he managed large projects and staff. *Id.* at 1-2. Beginning in 2006, Golatt worked as a Project Manager II for a contractor company, where he oversaw up to 20 projects at a time, some valued at up to $1 million. *Id.* Immediately prior to being selected for the Facilities Coordinator position, Golatt worked for PGCPS as a Planner II, a role in which he was responsible for all roofing projects and playground improvements for all 218 schools within the Prince George's County Public Schools system. *Id.* According to the Board, Golatt received the highest scores from the interview panel and "demonstrated his ability to manage projects and impressed the [hiring] panel with his child-centered approach." Belcher Decl. ¶ 7, ECF No. 25-9.

"Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision," provided that the decision was not based on unlawful criteria. *Evans v. Techs. Applications & Servs. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). On a failure to promote claim, once an employer asserts that the chosen candidate was more qualified, the plaintiff must present proof that the employer's explanation was pretextual by showing that he was "the better qualified candidate for the position," *id.* (citations omitted), or by "amassing circumstantial evidence that otherwise undermines the credibility of

the employer's stated reasons." *Adams*, 640 F.3d at 559–60. A plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *Id.* at 560 (quoting *Jimenez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Here, Golatt has a college degree, which is a preferred credential for this position, while Howerton does not. *See Wileman v. Frank*, 979 F.2d 30, 37 (4th Cir. 1992) ("When two applicants meet the minimum educational qualifications of a position, Title VII does not prevent an employer from preferring the applicant who has educational qualifications which surpass the minimum requirements of the position."). Moreover, Golatt had at least ten years of management experience at the time of his promotion, in addition to four years as the owner of a general contracting company. Def.'s Mem. Supp. Mot. Summ. J. Ex. 9. Howerton's management experience was limited to approximately six months as an Acting Maintenance Supervisor. Howerton Aff. ¶¶ 17, 28. Although Howerton testified that he and Golatt had "similar qualifications" and that, "I think I probably had an edge in terms of years of experience and being with the Board," Howerton Dep. 183:11–21, Oct. 30, 2014, ECF No. 27-1, a plaintiff's personal assessment of his qualifications is not enough to rebut the employer's explanation or to show discrimination, *see Evans*, 80 F.3d at 960. Moreover, there is no evidence that a candidate's duration of experience with PGCPS is a relevant factor or would make up for a comparative lack of education and management experience. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) ("We do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Where Golatt's qualifications are clearly superior, Howerton has not offered evidence sufficient to rebut the Board's nondiscriminatory reason for selecting another candidate. *See Evans*, 80 F.3d at 960 (granting

summary judgment because the plaintiff failed to show that she was more qualified for a promotion than the man selected).

### 2. Shops Coordinator

On the Shops Coordinator position, the Board has also offered a legitimate, nondiscriminatory reason for its decision. The Board submitted a letter establishing that PGCPS offered the job to an employee as an accommodation under the Americans with Disabilities Act ("ADA"). The letter, dated February 7, 2013, indicates that when notified that the employee was seeking a reasonable accommodation to a "less stressful" position to meet his medical needs under the ADA, the PGCPS identified three positions, including the Shops Coordinator position, that were available and would meet the employee's needs. *See* Def.'s Mem. Supp. Mot. Summ. J. Ex. 13, ECF No. 25-14. The letter instructs the employee to respond by February 14, 2013, "with your decision to either accept one of the above listed positions or to remain in your current position." *Id.* The February 14 letter predates Howerton's April 2013 application for the Shops Coordinator position.

The Board asserts that it transferred the employee to the Shops Coordinator position to address the ADA issue, so there was no competitive process to fill that position. At his deposition, Howerton acknowledged that race was not a factor in the selection process for the Shops Coordinator position.[2] Howerton does not argue that the ADA accommodation is a pretext for discrimination, and he offered no evidence to rebut the Board's position. There is

---

[2] Although the Shops Coordinator position is not expressly referenced in the deposition excerpt submitted, the context of the discussion, which occurs immediately before Howerton is questioned about the "the next position" that Howerton applied for in August 2013, Howerton Dep. 272:7–12, indicates that Howerton's acknowledgment related to the Shops Coordinator position, which was the last position for which Howerton applied before August 2013.

thus no genuine dispute of material fact that the Board offered the Shops Coordinator position to another candidate for a legitimate, nondiscriminatory reason.

### C.   Evidence of Intentional Discrimination

Although the Board has offered evidence of a legitimate, nondiscriminatory reason for failing to promote Howerton to either the Facilities Coordinator or Shops Coordinator position, and Howerton has not offered evidence specifically to refute those explanations, the Court is mindful that despite "the intricacies of proof schemes," the goal remains the resolution of the "ultimate question" whether an employee has been "the victim of intentional discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (internal citations and quotation marks omitted).   The ultimate question is "whether the plaintiff has generated a genuine dispute of material fact that she is the victim of intentional discrimination, notwithstanding facially plausible reasons offered by the employer for its adverse employment action." *Id.* at 302 (Davis, J., concurring).

Here, Howerton has offered some direct evidence indicating that race was a factor in how he was treated in the promotion process.   Specifically, he has offered evidence that the Assistant Superintendent had told him that "things were going to change" and directed him to hire someone who was African American, and that Belcher specifically told him that he could not be allowed to manage others because he "only hired white people."   Howerton Aff. ¶¶ 19–20, 40. Although the Board correctly notes that Belcher's statement could be construed as opposing Howerton's promotion because of his perceived racial bias, rather than because of his own race, when viewed in the light most favorable to the nonmoving party, the statement could be construed as providing evidence to support a racial motivation for not promoting Howerton, specifically that Howerton's race would necessarily cause him to only hire white people.   Thus,

although there is a marked disparity in qualifications between Howerton and the individual hired for the Facilities Coordinator position, there is sufficient evidence to support the claim that race was at least "a motivating factor" in the decision not to promote Howerton, particularly given that he was deemed qualified but never received an interview.   Under the Civil Rights Act of 1991, liability can be established if race "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (codifying the mixed motive theory).   Although proof that the employer "would have taken the same action in the absence of the impermissible motivating factor" would limit available damages, liability could still be found if there was a mixed motive. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).   Thus, summary judgment is denied on the Title VI claim for failure to promote to the Facilities Coordinator position.

With respect to the Shops Coordinator position, however, there is undisputed evidence that the position was filled to provide a reasonable accommodation to an employee with a disability.   Unlike the Facilities Coordinator position, where interviews occurred but Howerton was not interviewed, there was no competitive process to fill the Shops Coordinator position. Thus, the Court concludes that there is no genuine issue of material fact on whether there was race discrimination in that promotion decision.   Accordingly, the Court grants the motion for summary judgment on the claim of failure to promote to the Shops Coordinator position.

**V.     Hostile Work Environment**

The Board also seeks summary judgment on Howerton's hostile work environment claim. Because Howerton did not raise hostile work environment in his EEOC charge, only his Title VI hostile work environment claim remains. *See supra* Parts II & III.   A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult

that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleu Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). Such a claim is available under Title VI. *See Peters*, 327 F.3d at 315 (stating that Title VI prohibits intentional discrimination); *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 983 (4th Cir. 1997) (recognizing hostile work environment as a form of intentional discrimination) (quoting *Kolstad v. Am. Dental Ass'n*, 108 F.3d 1431, 1439 (D.C. Cir. 1997)); *Fordyce v. Prince George's Cnty. Md.*, 43 F. Supp. 3d 537, 546 (D. Md. 2014) (considering a Title VI hostile work environment claim); *Rogers v. Bd. of Educ. of Prince George's Cnty.*, 859 F. Supp. 2d 742, 753 (D. Md. 2012) (same). To establish a hostile work environment claim, a plaintiff must show that there is (1) unwelcome conduct; (2) based on the plaintiff's race; (3) that is sufficiently severe or pervasive enough to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) that is imputable to the employer. *Boyer-Liberto*, 786 F.3d at 277.

### A. Unwelcome Conduct Based on Race

Howerton alleges several instances of unwelcome conduct, beginning in April 2011, when Dr. Potter asked Howerton, the Acting Maintenance Supervisor, to hire an African American employee for the Lead Carpenter position. Dr. Potter told Howerton that the interview process was holding back African American applicants, and that constituents and high ranking officials, including an African American Maryland state senator, were pressuring her to place an African American employee in the position. When Howerton refused to hire the African American employee, Dr. Potter became agitated and told Howerton that he better have his "i's dotted and t's crossed." Howerton Aff. ¶ 26. Shortly thereafter, Howerton's position was eliminated and he was returned to a non-supervisory position. Then in February 2012, Belcher, who was Howerton's new supervisor, told Howerton that he could not be placed in a supervisory

position because Howerton would only hire white applicants. *Id.* ¶ 40. Belcher repeated the statement on several occasions in February 2012, including to other employees, making it difficult for Howerton to interact with his coworkers, most of whom were African American. *Id.* ¶ 42.

Other than these discussions, Howerton does not allege any statements or actions that explicitly referenced race or displayed a racial animus. He did allege a series of otherwise race neutral unwelcome actions, mostly by Belcher, including (1) in January 2012, Belcher issued a reprimand letter to Howerton arising from Howerton's confrontation with a coworker; (2) in February 2012, Howerton received or was told about several anonymous phone calls claiming that Howerton had assaulted Belcher, had been arrested, and had sexually harassed female employees; and (3) at that time, Belcher told Howerton that he had found no evidence of sexual harassment, but then asked what would happen if Howerton's wife found out. Howerton also alleges that in March 2012, Belcher refused to interview him for the Facilities Coordinator position, and that Belcher at various times threatened him, sought to "paper" his personnel file, and refused to interview him for positions for which he was qualified.

There is a legitimate question whether these additional incidents of unwelcome conduct can be deemed to be harassment based on race. None involved racial slurs or stereotypes. Courts have held, however, that discriminatory intent for otherwise neutral conduct can sometimes be inferred from an earlier act of discrimination. For example, in *Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir. 2000), a firefighter engaged in a verbal tirade against the plaintiff, laced with obscenities and slurs related to her gender, then later engaged in additional unwelcome conduct such as spreading rumors that the plaintiff was advocating for procedures that would endanger firefighters and refusing to follow the plaintiff's orders at a fire scene. *Id.*

at 154–55. Even though these later incidents did not explicitly reference gender, the court found that "a factfinder would be entitled to infer that any harassment" the co-worker directed at the plaintiff later, "with or without obscenities, was gender-based." *Id.* at 156.

Although the Board correctly notes that Belcher's comment that Howerton would only hire white people technically expresses a negative opinion about Howerton's allegedly racially biased views, rather than Howerton's own race, it is within the realm of comments that a reasonable jury could consider to exhibit a racial animus against Howerton because he is white. In turn, it could conclude that at least some of the subsequent acts of Belcher were based on race. *Howley*, 217 F.3d at 156.

## B.    Severity and Pervasiveness

Nevertheless, Howerton's hostile work environment fails because he has not provided sufficient evidence to establish that the unwelcome conduct was severe and pervasive enough "to alter the plaintiff's conditions of employment and to create an abusive work environment," which is one "permeated with discriminatory intimidation, ridicule, and insult." *Boyer-Liberto*, 786 F.3d at 277. This prong of the analysis has both subjective and objective components. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993)). It requires a showing that the plaintiff subjectively perceived the environment as hostile or abusive, and that an objective, reasonable observer from the plaintiff's position would perceive the environment as hostile or abusive. *Id.* Howerton has offered evidence of his subjective belief that he faced a hostile work environment in that following the conversation with Belcher about sexual harassment, he actually emailed a union representative to complain about a hostile work environment, Howerton Aff. ¶ 50, and later complained about race discrimination to the EEOC and informally to supervisors. *See Spriggs*,

242 F.3d at 185–86 (concluding that the plaintiff's complaints to supervisors about harassment, among other reasons, showed that he believed the environment was hostile or abusive).

As for the objective component, that "determination is made by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 23) (internal quotation marks omitted). "It is not, and by its nature cannot be, a mathematically precise test." *Id.* (quoting *Harris*, 510 U.S. at 23) (internal quotation marks omitted). A single episode, if sufficiently severe, could establish a hostile work environment. *Boyer-Liberto*, 786 F.3d at 280–81. But simple teasing, offhand comments, and isolated incidents, unless extremely serious, do not amount to discriminatory changes in employment. *Id.*

As of February 2012, when Howerton complained about a hostile work environment, there was not sufficient evidence to support an objective conclusion that such an environment existed. Neither of the two discussions in which race was mentioned, Associate Superintendent Potter's statement in April 2011 that she wanted a particular African American employee hired and that Howerton "needed to play ball," and Belcher's statement in February 2012 that Howerton could not be put in charge of maintenance personnel because he "only hired white people," involved any racial slurs or racially charged language so offensive as to be "physically threatening or humiliating" to the point of establishing a hostile work environment individually or collectively. *Id.* at 277–80 (finding that given the extremely degrading and humiliating characteristic of the term, the use of "porch monkey" twice over a 24-hour period could be

severe enough to constitute hostile work environment).  Notably, these incidents were separated by 10 months and involved different individuals.

The January 2012 reprimand letter, which pre-dated Belcher's comments, was a reaction to an undisputed confrontation between Howerton and another employee where there is no evidence that the incident was instigated for racial reasons.  Although Howerton disputes Belcher's finding that Howerton was at fault, the letter was not publicized within the office and was not "physically threatening or humiliating." *Id.* at 277.

Howerton did receive or hear of three anonymous phone calls during a five-day period from February 7–12, 2012 claiming that Howerton was being investigated for or arrested for assault, that he had been in a fight with Belcher, and that he had sexually assaulted female employees.  Belcher then told Howerton that there was no evidence of sexual harassment, but asked "What would happen if your wife found out?"  Howerton Aff. ¶ 49.  Although these unsolicited calls and conversations are of the type that could contribute to a hostile work environment, they are insufficient without more.  Even if one assumes that the anonymous callers were aware of and motivated by Belcher's comment about Howerton's propensity to hire white people, and that Belcher's statement about sexual harassment was intended to intimidate Howerton, the calls did not involve discussion of race, racially charged language, or unqualified threats, were isolated to this five-day period, and were never repeated over the next two years until this case was brought.  Thus, even combined with the earlier comments and the reprimand letter, they were not sufficiently severe or pervasive to establish an environment "permeated with discriminatory intimidation, ridicule, and insult" as to alter the conditions of Howerton's employment. *Boyer-Liberto*, 786 F.3d at 277; *see also Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190–91 (4th Cir. 2004) (granting summary judgment on hostile work environment

where a supervisor once said she did not know how to work with black males, the plaintiff believed that the supervisor undermined the recruitment and careers of black employees, the plaintiff received a critical evaluation and personal attacks, but there were no racial slurs or epithets); *Orenge v. Veneman*, 218 F. Supp. 2d 758, 768–69 (D. Md. 2002) (granting summary judgment on hostile work environment where there were five racist comments over seven years, plaintiff was investigated for erroneous travel reports, she perceived discussions about closing her office as threats to transfer her, and she was required to reveal negative aspects of her personnel files pursuant to agency policy).

Beyond February 2012, there were no incidents in which Belcher or others directly engaged Howerton with acts of racial intimidation, ridicule, or insult. The other conduct referenced by Howerton generally consisted of Belcher's responses to actions by Howerton. When he applied for promotions, Belcher decided not to interview him. When Belcher complained of discrimination or retaliation, Belcher responded with statements that could be construed as threats or warnings to him not to complain. With one exception in May 2013, the alleged "papering" of his personnel file consisted of responses to two other incidents in which Belcher got involved in a confrontation with another employee, where there was no evidence that the incident was initiated for racial reasons, or that the other employee had a racial motivation or even knew of the earlier statements relating to race. Some of these actions provide evidence to support Belcher's failure to promote and retaliation claims. *See supra* Part IV.; *infra* Part VI. But they were not "physically threatening or humiliating" acts akin to the verbal and physical harassment that typically characterizes a hostile work environment, and there is no evidence that these personnel actions were so debilitating to Howerton as to "unreasonably interfere[] with [his] work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 23)

(internal quotation marks omitted).  Thus, a reasonable jury could not conclude that the alleged unwelcome acts, individually or collectively, qualitatively or quantitatively, created an environment where "the workplace is permeated with discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Id.* at 277; *Orenge*, 218 F. Supp. 2d at 768-69.  Summary judgment is therefore granted on Howerton's Title VI hostile work environment claim.

## VI.  Retaliation

The Board also seeks summary judgment on Howerton's retaliation claims.  As discussed above, Howerton's Title VII retaliation claim is limited to retaliatory acts related to the filing of the second EEOC charge on June 20, 2013. *See supra* Part II.  His Title VI retaliation claim may encompass retaliatory acts occurring after March 18, 2012, the earliest date of the statute of limitations period. *See supra* Part III.

Title VII prohibits retaliation against an employee because the employee has "opposed" an "unlawful employment practice."  42 U.S.C. § 2000e-3(a).  Similarly, the Fourth Circuit has held that there is a private right of action under Title VI for retaliation by institutions receiving federal education funds. *Peters*, 327 F.3d at 318.  The existence of a Title VI retaliation claim derives from the United States Department of Education's implementing regulations to Title VI, which provide that:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

34 C.F.R. § 100.7(e) (2015); *Peters*, 327 F.3d at 318.

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must prove that (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff, and "(3) that there was a causal link between the two events." *Boyer-Liberto*, 786 F.3d at 281 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)) (internal quotation marks omitted). The same standard applies for Title VI retaliation claims. *See Peters*, 327 F.3d at 320 (citation omitted). Employees engage in a protected activity when they file formal discrimination complaints or "complain to their superiors" about suspected unlawful discrimination. *See Boyer-Liberto*, 786 F.3d at 281 (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003)).

### A.      Protected Activity

Howerton has offered evidence that he engaged in numerous instances of protected activity. First, in August 2012, Belcher complained to Keith Miles, the Chief of Supporting Services, that Belcher had not been interviewed for the position of Facilities Coordinator, then filed a grievance against Belcher with his union. Howerton Aff. ¶¶ 53-54. On September 5, 2012, Howerton and his union representative met with Belcher and Monica Goldson, the Chief Operating Officer, to discuss the grievance. In that meeting, Howerton specifically complained about discrimination and possible retaliation. *Id.* ¶ 60. Then on January 10, 2013, Howerton filed a formal EEOC discrimination charge. Both the internal complaints and the EEOC complaints constitute protected activity. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 273 (4th Cir. 2001).

### B.      Adverse Employment Actions

In the months following this series of complaints, Howerton was subjected to a series of activities that, taken together, could reasonably be found to be materially adverse employment

actions, including: (1) the January 17, 2013 reprimand letter following the January 8, 2013 incident with Lacy Lanham; (2) the May 2, 2013 reprimand letter regarding Howerton's work relating to Old Greenbelt Middle School, which was placed in his personnel file without notice to him; (3) the June 3, 2013 suspension of Howerton for the April 3, 2013 incident with Antonio Proctor; and (4) the June 27, 2013 performance evaluation in which Belcher gave Howerton his first performance evaluation since 2011 and scored him substantially lower than his previous evaluations. *See* Pl.'s Opp. Ex. 15.

Although there is no dispute that a suspension would qualify as a materially adverse employment action, the Board argues that the other activities, including letters of reprimand and negative performance evaluations, do not constitute materially adverse employment actions. Prior to 2006, courts held that a materially adverse employment action was one that affected the terms, conditions, and benefits of employment. *See, e.g.*, *Von Gunten v. Maryland*, 243 F.3d 858, 868 (4th Cir. 2001) (holding that a negative performance evaluation that did not affect the terms, conditions, or benefits of employment did not constitute a materially adverse employment action), *abrogated by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see also James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (same); *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 652 (4th Cir. 2002) (same). In *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53 (2006), the Supreme Court rejected the position that a materially adverse employment action must necessarily affect the terms, conditions, and benefits of employment, and instead established an objective test: an action is "materially adverse" if a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 67–68 (internal citation

and quotation marks omitted).  Thus, although "petty slights or minor annoyances that often take place at work" are not actionable, actions "that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers" can be the subject of a retaliation claim. *Id.* at 68.

Under this test, reprimand letters placed in an employee's personnel file could constitute materially adverse employment actions.  *See Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015); *Belyakov v. Leavitt*, 308 F. App'x 720, 729 (4th Cir. 2009) (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 n.2 (4th Cir. 2007)).  In this case, the letters even indicated that they could impact the terms and conditions of employment.  The January 17, 2013 reprimand letter explicitly stated that "any future instances involving this or more similar behavior will result in your recommendation to the [Superintendent] of Schools for more serious disciplinary action against you, up to and including termination." Pl.'s Opp. Ex. 10.  The May 2, 2013 reprimand letter also warned Howerton that it was one step along a process that could ultimately end in termination of his employment with PGCPS.  *See* Pl.'s Opp. Ex. 12 ("Failure to [meet all milestones and deadlines] may result in further disciplinary action which may include the withholding of a salary increment when due, suspension, or termination of your employment with Prince George's County Public Schools.").  The reprimand letter actually did have such an impact, because when Howerton was suspended on June 3, 2013, the letter of suspension specifically referenced the January 9, 2012 and January 17, 2013 letters as factors contributing to the suspension decision.  *See* Pl.'s Opp. Ex. 13, at 1.

Likewise, under the *White* standard, the June 27, 2013 performance evaluation could constitute an adverse employment action, even without a specific link to the terms and conditions of employment.  *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007);

(considering negative performance review to be an adverse employment action); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997). Here, although the Board argues that the review provided an "overall satisfactory rating," Def.'s Reply Ex. 2, at 3, ECF No. 27-2, the evaluation was remarkable because Howerton had consistently received all "Outstanding" ratings in the years leading up to 2011. On this occasion, he received no ratings above "Meets Standards" (the third highest level) and received several "Below Standards" and "Unsatisfactory" ratings. Thus, although not every performance evaluation would qualify as "materially adverse," *see, e.g., Parsons v. Wynne*, 221 F. App'x 197, 198–99 (4th Cir. 2007) (stating, without detail, that a particular performance evaluation did not constitute an adverse action), a reasonable jury could conclude that the precipitous change in Howerton's ratings was the type of action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 67–68; *Boumehdi*, 489 F.3d at 793.

When considered together, this series of events, including two reprimand letters, a suspension, and a significantly downgraded performance evaluation could reasonably be viewed as an effort to "paper" Howerton's file, which can constitute a form of materially adverse employment action. *See Kim*, 123 F.3d at 1060 (finding that "much lower performance evaluations" and evidence that the company had "papered" the personnel file with negative reports, including two written reprimands, along with a reduction in duties and required remedial training, established materially adverse employment action even without any discharge, suspension, or demotion).

## C.    Causation

The Board further argues that it is entitled to summary judgment on retaliation because there is insufficient evidence to establish a causative link between the protected activity and the

adverse employment actions.  Although close temporal proximity between the protected activity

and the alleged adverse employment action can support an inference of causation, "the passage

of time" does tend to "negate the inference of discrimination." *Price v. Thompson*, 380 F.3d

209, 213 (4th Cir. 2004).  When there is a more significant temporal gap, however, "courts may

look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant, Inc.*,

478 F.3d 640, 650 (4th Cir. 2007).  Courts have found that, with additional evidence, causation

can be established even where the protected activity and adverse employment action are

separated by more than six months.  *See Price*, 380 F.3d at 213 (finding a *prima facie* case of

retaliation where nine to ten months passed between protected activity and the plaintiff's

termination); *McNairn v. Sullivan*, 929 F.2d 974, 977, 980 (4th Cir. 1991) (finding a causal

connection where the plaintiff was fired eight months after filing a complaint with the EEOC).

Here, there is temporal proximity in that the reprimand letters, suspension, and adverse

performance evaluation occurred over a six-month period following the series of protected

activities culminating with the EEOC charge on January 10, 2013.  The first reprimand letter was

issued only seven days after that filing.[3]  Although the other events occurred several months later

in May and June 2013, they were preceded by additional instances of Howerton complaining of

discrimination, including: (1) Howerton's February 2013 complaint to Goldson that Belcher was

"papering" his personnel file with derogatory information, in which he stated that he was seeking

legal advice; (2) his March 2013 complaint of discrimination to the PGCPS Compliance Officer,

followed by his discussion with Belcher about his concerns; and (3) Howerton's June 20, 2013

---

[3]  Although the Board asserts that causation is lacking because the January 2013 reprimand letter
was based on events that occurred on January 8, two days before the EEOC filing, the PGCPS
was already on notice of Howerton's protected activities from his internal complaint of
discrimination in September 2012.

EEOC charge. The adverse performance evaluation, for example, occurred only seven days after the June 20 EEOC charge.

Beyond temporal proximity, throughout this time period, Belcher and other PGCPS personnel made multiple statements that could be construed as threats of retaliation. When Howerton first complained to Belcher in August 2012, Belcher said, "Oh, I know how to handle this now. I got you now." Howerton Aff. ¶ 54. In December 2012, Belcher warned Howerton to stop asking questions and to be "careful." *Id.* ¶¶ 65–66. In March 2013, when Howerton complained again, Belcher told Howarton that he was "digging a deeper hole" for himself by complaining. *Id.* ¶ 82. Then in June 2013, two days before the performance evaluation, when Belcher learned that Howerton had complained about what he considered to be a discriminatory or retaliatory reprimand letter placed in his personnel file secretly, Belcher told Howerton that he was "digging a deeper hole," that he "better stop making trouble" or he would "end up gone," and that Belcher could make things more difficult for Howerton.[4] *Id.* ¶¶ 97–98. Although the Board characterizes the comments as petty slights, minor annoyances, and a simply lack of good manners, the comments came after Howerton raised concerns about discriminatory conduct, and, when viewed in the light most favorable to Howerton, could indicate an intent to take some adverse action against him as a result. Such statements provide evidence, beyond mere temporal proximity, to support an inference of retaliatory motive. *See Depaoli v. Vacation Sales Assocs., LLC*, 489 F.3d 615, 619 (4th Cir. 2007) (considering intervening statements such as "I'm not going to have any lawsuits on my watch" and "[the company president] doesn't want her here

---

[4]  Notably, certain threatening statements, particularly statements that could be construed as threats of termination like "end up gone," can be deemed to be materially adverse employment actions. *See Maron v. Va. Polytechnic Inst. & State Univ.*, 508 F. App'x 226, 230–31 (4th Cir. 2013) (threats to terminate employment, including threat to that the plaintiff needed to "become invisible" to keep her job, were sufficient to constitute an adverse employment action).

any longer" as evidence of causation for a termination one-year after the protected activity); *see*
*Lettieri v. Equant, Inc.*, 478 F.3d 640, 650–51 (4th Cir. 2007) (finding that a series of intervening
events that could be viewed as showing retaliatory animus over the months following the
protected conduct were sufficient to establish a causal link).

There were also actions that could be construed as supporting a finding of retaliation,
such as the fact that the May 2012 reprimand was placed in Howerton's personnel file without
his knowledge, and that the performance evaluation in June 2013 was Howerton's first in over
two years and was issued immediately following protected activity.[5]   Although the Board
correctly notes that some of these statements and actions are susceptible to multiple
interpretations, when they are viewed in the light most favorable to Howerton, they support a
reasonable inference that some of the adverse actions were caused by retaliation for protected
activities.

The Board also argues that the reprimand letters, suspension, and adverse performance
evaluation were entirely justified, and not retaliatory, because Howerton instigated the
altercations and negative acts that led to those actions.  Although there is significant evidence to
support this position, particularly in the letters and evaluations themselves, Howerton has
provided his account of these events which places the blame for these incidents on others and
explains the disciplinary action as unjustified retaliation.  He thus has created a genuine issue of

---

[5]   The Board, citing *Jones v. Koons Automotive, Inc.*, No. DKC 09-3362, 2013 WL 3713845, at
*5 (D. Md. July 15, 2013), argues that Howerton may not raise a claim for the first time in a
memorandum in opposition to a motion for summary judgment allegations about the May 2013
reprimand letter and the June 2013 suspension, which were not referenced in the Complaint.  The
Court declines to exclude consideration of these incidents because in referencing them to support
his general claim of retaliation, Compl. at 8, Howerton does not assert any new claims or causes
of action.  There is no requirement that a plaintiff list in the Complaint every fact that will be
used at summary judgment or trial.  In any event, the Court's denial of summary judgment on the
retaliation claim does not depend on consideration of this evidence.

material fact that cannot be resolved on summary judgment. The motion for summary judgment is therefore denied as to the Title VI retaliation claim.

As for the Title VII claim specifically, the negative performance evaluation is the only conduct occurring after Howerton filed the EEOC charge on June 20, 2013. The evaluation is sufficient to constitute an adverse employment action under *White*, *see supra* Part VI.2, and it is temporally close because Howerton received it only seven days after filing his June 2013 EEOC charge. There is thus a genuine issue of material fact as to whether he was retaliated against for filing the EEOC charge. Summary judgment on the Title VII retaliation claim is denied.

## CONCLUSION

For the reasons stated above, the Court rules that: (1) Howerton's claims under Title VII for discriminatory failure to promote him to the Facilities Coordinator position (in Count One) and for hostile work environment (Count Five) are DISMISSED for failure to exhaust administrative remedies; (2) the Motion for Summary Judgment is GRANTED as to the claims under Title VII (in Count One) and Title VI (in Count Two) of discriminatory failure to promote to the Shops Coordinator position; (3) the Motion is GRANTED as to Howerton's Title VI hostile work environment claim (Count Six); (4) the Motion is DENIED as to the Title VI claim for discriminatory failure to promote to the Facilities Coordinator position (in Count Two); and (5) the Motion is DENIED as to Howerton's retaliation claims under Title VII (Count Three) and Title VI (Count Four).  Count Three (Title VII retaliation) is limited to acts occurring after June 20, 2013, and Count Four (Title VI retaliation) is limited to acts occurring after March 18, 2012.

A separate Order follows.

Date: August 18, 2015

THEODORE D. CHUANG
United States District Judge